UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-20780-CR-COOKE

UNITED STATES OF AMERICA

v.

MANUEL FERNANDEZ,
                Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States files this sentencing memorandum. For the reasons set forth below, the government respectfully submits that the Court should sentence the defendant within the range recommended by the advisory Sentencing Guidelines and reject the defendant's request for a sentence below the recommended range.

*A.* *Introduction*

As the Court considers factors relevant to the appropriate sentence for this defendant, the government recommends that the Court start by revisiting the defense case during trial. That is when the defendant called five family members to testify for him. One after the other, each family member entered the courtroom, ascended the witness stand, took an oath to testify truthfully, and then proceeded to lie to the Court and the jury. As this was going on, the defendant sat at the defense table, knowing his family members were lying. Indeed, the defendant knew in advance that his family members were going to lie.

In his motion for variance (DE 219), the defendant has asked for a sentence of 30 months, which is well below whatever the final advisory guideline range will be after the Court rules on

the defendant's objections.[1] The defendant's rampant subornation of perjury is a compelling reason why a sentence below the applicable guideline range is not appropriate.

Every criminal case is unique, and every defendant is unique. Certainly, and as explained in more depth below, *see infra*, at 3-4, the defendant's ongoing and repetitive abuse of the position of substantial public trust that he occupied as an Aviation Safety Inspector is a very important consideration for the Court. However, what ultimately sets this defendant and this case apart is his willingness to abuse the judicial process by knowingly, willfully, and repetitively suborning perjury. While the defendant had a constitutional right to present a defense, he did not have the right to poison the judicial process by putting before the jury evidence he knew to be false.

At pages 3-14 of its response to the defendant's objections to the Presentence Investigation Report ("PSI") (DE 222), the government extensively reviewed and analyzed the perjured testimony of the defendant's five family members. This included: (1) outlining the government evidence that the defendant deployed each family member to counter; (2) identifying the precise

---

[1] Because of the defendant's conviction of the aggravated identity theft offenses in Counts 35-36, the recommended imprisonment range is a hybrid of the range for Counts 1 and 17-34, plus the 24-month consecutive mandatory minimum sentence for the first of the two aggravated identity theft counts of conviction. *See* PSI ¶¶ 189-90. For Counts 1 and 17-34, the PSI recommends a total offense level of 26, which with a criminal history category I yields an imprisonment range of 63-78 months. The additional 24-month consecutive mandatory minimum sentence for Counts 35-36 produces an imprisonment range of 87-102 months. *See id.* ¶ 190.

As discussed in earlier pleadings, the defendant has objected to two adverse recommendations in the PSI: the two-level upward adjustment for aggravating role under U.S.S.G. § 3B1.1(c); and the two-level upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1.

Based upon these objections, the defendant contends for Counts 1 and 17-34 his total offense level should score out to a level 22, which would correspond to an imprisonment range of 41-53 months. The additional 24-month consecutive mandatory minimum sentence for Counts 35-36 would bring the total range under the defendant's objections to 65-77 months. As noted in the text, in his sentencing memorandum the defendant has requested a downward variance to a term of imprisonment of 30 months, well below the advisory guideline range even if the Court were to accept the defendant's objections.

perjured testimony of each family member; (3) reviewing the facts demonstrating that the testimony indeed was perjured; and (4) analyzing the grounds establishing that the defendant knew his family members were going to be committing perjury before they testified.

Through detailing the range of perjury that the defendant sponsored, its intended significance in the trial, and the defendant's complicity for the delivery of the perjured testimony, the government's response highlighted *__some__* of the significant considerations that made the defendant's conduct so egregious. In addition, the Court should recognize that by suborning perjury to the extent that he did, the defendant displayed the degree of his disrespect for the Court and the judicial process, his lack of remorse for his criminal conduct that resulted in him being before the Court, and his willingness to enlist others to do his illicit bidding.

These facts more than suffice to demonstrate why the defendant does not merit below the applicable advisory sentencing range. Section B of this sentencing memorandum identifies several other considerations that add to the grounds in support of the sentence requested by the government. Section C responds to certain grounds proffered or suggested in the defendant's motion for variance.

    **B.**    *__Other Relevant Factors Supporting a Sentence Within the Range Prescribed by the Advisory Guidelines__*

        **1.**    **The Seriousness of the Defendant's Abuse of Public Trust**

One of the major considerations that the Court must take into account in fashioning an appropriate sentence is the nature and circumstances of the defendant's criminal conduct, as well as its seriousness. *See* 18 U.S.C. § 3553(a)(1) & (a)(2)(A). Particularly relevant under the facts of this case is the seriousness of the defendant's abuse of his public trust, as reflected in the defendant's bribery offenses.

On the day the defendant assumed his position as an Aviation Safety Inspector ("ASI"), he executed an affidavit in which he swore to "faithfully discharge the duties of the office on which I am about to enter." *See Gov't Exh. 2A*, at 2. That office of course carried a unique duty to the public. By virtue of this unique obligation that the defendant had to the public, through his criminal conduct the defendant likely abused the public trust placed in him to a greater degree than found in other public corruption offenses.

As a starting point, an ASI who takes bribes to turn his back on his duty as a public watchdog over the aviation industry threatens to erode public confidence in the safety of air travel, as well as public confidence in the fidelity of the officials and agency charged to oversee the aviation industry. In this case, however, the harm occasioned by the defendant's criminal conduct transcended a mere potential psychological impact.

Evidence from trial demonstrated that the defendant's betrayal of his duties to the public included conduct in which he acted in a manner to ignore and even obstruct his obligation to promote aviation safety. One manner in which the defendant did so was by giving Avcom Avionics & Instruments, Inc. ("AVCOM") advance warning of pending random inspections by the ASI assigned to oversee AVCOM, Donald Schoonover, thereby providing AVCOM an opportunity to hide possible safety issues from the ASI. *See* PSI ¶¶ 69-70 (summarizing evidence from trial).

The defendant also betrayed his obligation to protect aviation safety through the portion of the bribery scheme in which he continuously pilfered Honeywell and Delta technical data and redirected the data to AVCOM, which did not have a license or authorization to use it. At page 8 of his motion for variance (DE 219), the defendant claims that his ongoing theft of this property "furthered aviation safety." However, the defendant, who collected repeated bribes for this

conduct, was no Robin Hood, and his claim that he was serving the public interest through his criminal conduct is contrary to the evidence. During his testimony, Delta official James Griffie explained that the defendant created a potentially serious safety risk by misappropriating Honeywell and Delta technical data for the servicing of a flight computer and, then, directing the data to AVCOM, which was not approved to work with it.

This conduct does not merit the leniency the defendant has requested.

### 2.     The Egregiousness of the Defendant's Greed

During the search of AVCOM on June 27, 2013, agents seized the video retained on AVCOM's security system. The seized security video covered two-month time period starting on April 22, 2013, and included the defendant's two-week pay period ending on June 14, 2013, which was the period covered by the wire fraud charges in Counts 33-34. *See Gov't Exhs. 120-a & 121-164*. The government published representative portions of the security video during the testimony of Special Agent Santos Ramirez.

The seized video provided strong support for several important aspects of the government's case. For instance, by showing that the defendant was working at AVCOM throughout the entire two-week pay period at issue in Counts 33-34, the seized video proved the falsity of the defendant's claim that he had been medically unable to perform his FAA duties. Additionally, in illustrating the frequency and amount of time that the defendant spent at AVCOM, the seized video more broadly confirmed the depth of the defendant's association with AVCOM and, by extension, his co-conspirators Rolando and Patricia Suarez.

The seized video also conveys other important points for purposes of sentencing. By April 22, 2013, which is the first date captured on the seized video, the defendant had been successfully lining his pockets with bribes and other illicit payments from AVCOM for over three years.

Several months earlier, the defendant and his co-conspirators designed a new way to funnel money to the defendant by installing the defendant's mother on the AVCOM payroll as a ghost employee. Moreover, by April 22, the defendant had started negotiating an agreement with AVCOM in which he would become its Chief Operating Officer, with the possibility of eventually obtaining a 10% interest in the company. *See Gov't Exh. 108*, at 2 (introductory page to defendant's employment agreement with AVCOM).

But this was not enough for the defendant. After defrauding the public of its right to his honest services for over three years, on his way out the door at the FAA the defendant decided to find still more ways to make money by chiseling the public. As noted earlier, the seized video showed how the defendant was defrauding the public by taking sick leave, when in fact he was working an undisclosed side job at AVCOM that itself was prohibited by FAA rules. Indeed, the defendant's fraudulent use of sick leave not only included the 80-hour pay period covered by Counts 33-34, but also six days in the previous month. Those earlier days were May 15, 22, 24, 29, 30, and 31, 2013.

The events of May 15, 2013, were particularly telling. May 15 was the day that the defendant had to scurry out the AVCOM side door upon learning that AVCOM's assigned ASI, Donald Schoonover, had arrived for an unannounced inspection. *See* PSI ¶¶ 71-74 (summarizing evidence from trial). While the video of the defendant's panicked reaction to Mr. Schoonover's arrival might have appeared humorous on its face, the fact that the defendant was moonlighting at an FAA regulated entity was no laughing matter for the FAA. Sergio Lopez, the official who oversaw the defendant's office at the FAA, testified that if he had known the lone fact that the defendant was working an undisclosed job at AVCOM, that fact would have caused him to refer the matter to FAA security for criminal investigation.

The defendant's greed was so brazen and intense that his near brush with peril on the morning of May 15 did not cause him to tone down his conduct for his remaining time with the FAA. Indeed, it did not cause the defendant to tone down his conduct for even another 24 hours. As reflected by the security video, later the same day, once he was assured that the coast was clear, the defendant was back at AVCOM. *See id.* ¶ 75 (summarizing evidence from trial).

As was evident at trial, during the time of his criminal conduct the defendant was living comfortably. The defendant drove a Cadillac Escalade pick-up truck. *See, e.g.*, *Gov't Exhs. 65, 123, 130 & 137*. He lived (and continues to live) in a house with an upgraded kitchen and patio with a covered area with a bar and cooking area in a community that the PSI describes as a higher middle-class area. *See Gov't Exh. 102*; PSI ¶ 138. (The employment and financial sections of the PSI confirm that the defendant remains quite well-off financially. *See* PSI ¶¶ 146-188.) In short, the defendant's financial motive for his criminal conduct was nothing other than greed.

The defendant cannot suggest that his convictions stem from a single moment of weakness or personal failing. As noted earlier, the defendant's criminal conduct spanned over three years. Almost being caught red-handed with his hand in the proverbial cookie jar the day that Donald Schoonover showed up at AVCOM unannounced was not enough to tame the defendant and cause him to change course. Instead, on his way out the door of his federal employment, the defendant enlisted his mother-in-law to procure a forged doctor's note, which he then used in his fraudulent sick leave scam to squeeze every last possible dollar out of the U.S. Treasury and rip off the taxpaying public yet again.

The defendant's greed and the degree to which he elevated his appetite for money above basic obligations he owed to his employer and the public, coupled with his lack of remorse for his criminal conduct, are important elements of his personal characteristics relevant to the appropriate

sentence in this case. These elements, like the defendant's egregious obstruction of justice and his significant abuse of trust, weigh strongly against his request for a reduced sentence.

### C. The Matters Raised in the Defendant's Motion for Variance Do Not Call for a Sentence Below the Range Prescribed by the Advisory Guidelines

#### 1. The Defendant's Letters of Support

With one exception, the letters of support that the defendant has appended to his motion, *see* DE 219-1, do not address his criminal conduct. The exception is the letter from Mr. Amico, one of the defendant's lawyers and a personal friend, who tries to rationalize the defendant's criminal conduct based upon a theory unsupported by the evidence from trial. Even though the letters of support include letters from two of the defendant's family members who perjured themselves for the defendant – the defendant's wife and his mother-in-law – the letters of support not surprisingly do not address the defendant's subornation of perjury at trial.

While the defendant's letters of the support reflect that he has loyal and caring friends and family members and that he also has been loyal and kind to them, they should not cause the Court to vary from the recommended guideline range.

#### 2. The Impact on the Defendant's Family and Business

a. People harmed by a defendant's criminal conduct can include innocent family members. The impact of the defendant's upcoming sentence upon his daughter is unquestionably sad. However, it does not diminish the seriousness of the defendant's criminal conduct or the need for a sentence that properly responds to the defendant's offenses.

b. At page 8 of the defendant's motion for variance, the defense mistakenly overstated a health issue of the defendant's wife, stating that she "was recently diagnosed with an inoperable brain tumor." The defense has since clarified the nature of this condition to the Probation Officer. That clarification will be reflected in the revised PSI. Without getting into the details here, the

government simply notes that as the condition will be clarified and explained in the PSI, the health of the defendant's wife does not appear to raise any concerns that should impact the defendant's sentence.

    **c.**    The defendant's suggestion regarding the potential impact the Court's sentence could have on the defendant's aviation business likewise is overstated. The viability of the defendant's aviation business does not appear dependent upon the length of his sentence. Rather, regardless of the length of the defendant's sentence, the business does not appear likely to continue as a viable, ongoing concern.

Paragraph 157 of the PSI notes that in an e-mail dated June 27, 2019, the defendant advised that because of his recent conviction, his largest customer terminated its contract with his business and that, as a result, he and his wife will be forced to close the business. Paragraph 157 continued that in a later e-mail the defendant noted a contract with another customer also was terminated, plus a contract with another customer was due to expire on August 15, 2019, and he was unsure if it would be renewed.

    **d.**    It also is worth noting that, regardless of the health of the defendant's aviation business, the defendant and his wife retain significant wealth.

        **i.**    Based upon the financial summary in paragraph 178 of the PSI, the defendant holds considerable assets, both under the name of his aviation business and independent of that business. The discussion in the employment section of the PSI, including paragraphs 149-151 and 157, reflect that the aviation business holds assets of significant value, regardless of its viability as an ongoing concern.

        **ii.**    The PSI also reflects that the defendant's wife holds wealth beyond that attributed to the defendant in the financial summary in paragraph 178. In particular, the

financial summary in paragraph 178 of the PSI lists six significant assets with asterisks alongside them. The asterisks indicate that the values listed in paragraph 178 represent only the defendant's share of the asset's value. The PSI indicates that the defendant's wife holds equivalent interests of her own in these six assets. *See* PSI ¶¶ 148, 158, 169, 179, 181 & 182. As a result, the joint interest of the defendant and his wife in the six assets designated with asterisks is double the amount listed in paragraph 178 of the PSI.

### 3. Lack of Prior Criminal Record

The government respectfully submits that what the defendant describes at page 16 of his motion as a "Lack of Criminal History" is better understood as a lack of a prior criminal record. The Court should not interpret the phrase "Lack of Criminal History" to imply that the defendant's criminal conduct was a brief transgression over a discrete moment in time. As noted above, the defendant's bribery scheme spanned over three years. He then punctuated his criminal conduct with the sick-leave fraud as he was leaving the FAA.

Nor should the Court view the defendant's lack of a prior criminal record as indication that he is not capable of repeating his criminal conduct in the future. For at least two reasons, the defendant's obstruction of justice at trial is particularly probative in this regard. First, it occurred very recently. Second, it demonstrated that becoming a subject of the criminal justice system has not been sufficient to reform the defendant's willingness to violate core societal rules.

### 4. Absence of Upward Role Adjustment for Rolando Suarez

As noted earlier, the PSI recommends an upward role adjustment for this defendant for recruiting his mother to participate in the criminal conduct. Paragraph 201 of the PSI notes that Rolando Suarez did not receive an upward role adjustment and that the absence of such an adjustment may result in an unwarranted sentencing disparity. At page 6 of his motion for variance

(DE 219), the defendant cites paragraph 201 of the PSI, apparently to support his argument for a downward variance.

This argument is misplaced. The defendant was far more culpable in his mother's participation in the offense conduct. The defendant's mother hid ***the defendant's*** bribe proceeds. This fact, coupled with other facts – including the gravity of the defendant's abuse of trust and his subornation of perjury through *five* separate family members – more than suffice to justify any disparity resulting from the absence of an aggravating role adjustment in Rolando Suarez's case.

### 5.      Claimed Disparity of Sentences in Other Cases

In an attempt to support his request for a variance, at pages 17-18 of his motion for variance (DE 219), the defendant very briefly identifies, in one or two sentences per case, the charges and sentences for six other defendants prosecuted in federal corruption cases in other federal districts at different times in a 26-year span. The defendant's very brief summaries of the six case cited in his motion lack sufficient detail to indicate that they provide any meaningful guidance for the defendant's pending sentencing.

On its face alone, this case differs in a number of significant ways from the cases cited in the defendant's motion. For instance, none of the defendants in those cases were FAA Aviation Safety Inspectors. Indeed, none of them were FAA employees.

In addition, this defendant went to trial. Based upon the limited summaries in the defendant's motion, it appears that only one of the six defendants referenced in the defendant's motion went to trial, meaning that the other five resolved their cases by guilty pleas.

Nothing in the defendant's summaries indicate that the defendants in those cases obstructed justice in their prosecutions, much less to the degree that this defendant did. The summaries in the defendant's motion do not indicate that the offense conduct in those cases had the type of potential

public safety impact that this defendant's offense conduct had. Nor does it appear that any of the defendants in those cases engaged in aggravated identity theft as part of their offense conduct.

For the most part, the prosecutions and sentences are not particularly recent. The most recent of the six cases cited in the defendant's motion involves a sentence issued 5 ½ years ago. The sentences in the other five cases were handed down, respectively, in 1993, 1996, 2004, 2007, and 2013.

As noted previously, every criminal case is unique, and every defendant is unique. Given the number of convictions and sentences handed down in federal criminal cases nationwide, the defendant's perfunctory descriptions of a hand-picked collection of six corruption prosecutions over the last 26 years is of no value for the Court. Any suggestion that these cases should be viewed as setting a floor for the defendant's sentence is wholly misplaced.

To the extent that the defendant suggests that the Court should look to other prosecutions as a guide for the appropriate sentence in this case, the government would refer the Court to *United States v. Vital Frederick*, Case No. 13-20218-Cr-Moore. *Frederick* was a public corruption case in this District, in which the defendant received an 81-month term of imprisonemnt. The facts of that case, as related in the government's response brief on appeal before the Eleventh Circuit, 2014 WL 4255060, bear a number of significant similarities to the facts in the case.

Like this defendant, Frederick held a public safety position and took bribes to act contrary to his obligations to the public. Frederick, a City of Miami Police Officer, took $1,400 in bribes (i) for providing protection to a courier cashing stolen checks at a check-cashing store and (ii) for using his police laptop to access law enforcement database to obtain personal identifying information of 52 individuals to file false income tax returns. *See* 2014 WL 4255060, **4-8.

The jury found Frederick guilty of all seven counts in the indictment. Counts 1-4 charged him with obstructing commerce by extortion, through protecting and facilitating the cashing of fraudulent checks in return for payment, in violation of 18 U.S.C. § 1951(a). Count 5 charged him with possessing 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3). Counts 6-7 charged him with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). *See id*. at **1-2.

Similar to this case, Frederick's recommended advisory sentencing range was a hybrid of the range for Counts 1-5, plus the 24-month consecutive mandatory minimum sentence for the first of the two aggravated identity theft counts of conviction. *See id*. at **14-16. As to Counts 1-5, the Court found that Frederick scored out to a level 23. Similar to this case, Frederick's offense level included a two-level upward adjustment for obstruction of justice for perjured trial testimony, (although, in Frederick's case, he committed perjury on his own behalf, rather than enlisting others to commit perjury for him). *See id*. at **16-22. Similar to this case, Frederick had a criminal history category of I. For Counts 1-5, Frederick's resulting imprisonment range was 46-57 months. With the added 24-month sentence for the first of the two aggravated identity theft counts of conviction, Frederick's total range was 70-81 months. The Court sentenced him to 81 months. *See id*. at **22.

Frederick's sentence of 81 months is comparable to the potential sentencing ranges that this defendant faces. As noted in footnote 1 of this response, if the Court were to sustain this defendant's two objections to the guideline recommendations in the PSI, he would face a total recommended imprisonment range of 65-77 months. If the Court were to overrule both of the defendant's objections, he would face a range of 87-102 months.

### 6. Goals of Sentencing

At pages of 18-20 of his motion for variance (DE 219), the defendant questions the deterrent impact of a significant sentence in this case. In contrast to a generic white-collar offender, this defendant was a public official in a public safety position who took repeated bribes in excess of a three-year period to betray his obligations to the public. The government respectfully submits that the facts presented at trial, as amplified in the PSI and this pleading, support a sentence within the applicable guideline range.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

*/s/ Michael S. Davis*
MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027 (phone)
(305) 536-4675 (fax)
E-mail:  michael.davis2@usdoj.gov

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed a copy of this document with the Clerk using CM/ECF.

*/s/ Michael S. Davis*
MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY